QUALITY MANUFACTURING )
SYSTEMS, INC.,                )
                             )
        Plaintiff            )
        Counterclaim-Defendant )
                             )      No. 3:13-0260
v.                           )      Magistrate Judge Bryant
                             )      **Jury Demand**
R/X AUTOMATION SOLUTIONS, INC., )
                             )
        Defendant            )
        Counterclaim-Plaintiff )

## MEMORANDUM AND ORDER

Pending in this case is Plaintiff's cross-motion for partial summary judgment (Docket Entry No. 40). Defendant has filed a response (Docket Entry No. 47) and Plaintiff has filed a reply (Docket Entry No. 52).

Pursuant to the consent of the parties, this case is before the undersigned Magistrate Judge for all proceedings (Docket Entry No. 48).

For the reasons stated below, the Court **GRANTS** Plaintiff's motion for partial summary judgment.

### STATEMENT OF THE CASE

In this diversity action removed from the Chancery Court for Rutherford County, Tennessee, Plaintiff Quality Manufacturing Systems, Inc. ("QMSI") alleges that Defendant R/X Automation Solutions, Inc. ("RXAS") has breached the Pill Counter Agreement between the parties dated July 23, 2007, by wrongful termination of the agreement. QMSI asserts causes of action for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, and intentional

interference with business relationships. As relief, QMSI seeks a declaratory judgment that the Pill Counter Agreement remains in effect and binding on the parties, together with an award of compensatory and punitive damages (Docket Entry No. 1-1).

Defendant RXAS has filed its answer denying liability, asserting affirmative defenses, and asserting a counterclaim under theories of breach of contract, violation of the Tennessee Consumer Protection Act, and violation of the Tennessee Uniform Trade Secrets Act. RXAS, by way of counterclaim, seeks a declaratory judgment that the Pill Counter Agreement lacks a termination provision and therefore is terminable by either party upon reasonable notice. RXAS also seeks an award of monetary damages (Docket Entry No. 17).

### STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

A party may obtain summary judgment by showing "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine dispute of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**STATEMENT OF PERTINENT FACTS**

The pertinent facts in this action are almost altogether undisputed by the parties. QMSI is a corporation based in LaVergne, Tennessee, that provides custom designed industrial automation and control systems for its customers, most of whom are engaged in the automated pharmacy industry. QMSI also provides general contracting services in which it designs automated processing facilities, purchases and resells to the customer the mechanical components of the system, develops the software that allows the mechanical systems to work together, and supervises the construction and installation of those hardware and software systems to the customer's requirements.

RXAS builds machines for automated inventory management, product packaging and pharmaceutical dispensing. QMSI and RXAS have done business with each other for some time. QMSI has written software to integrate RXAS machines into automated pharmacy environments, and QMSI has purchased several million dollars worth of RXAS equipment for installation in QMSI's customers' facilities.

By the spring of 2007, RXAS had developed an operational prototype of a machine capable of dispensing pills into prescription bottles at high speed and volume, called in the industry a "pill counter." The RXAS machine held great opportunity for profit because alternative pill counters then available in the marketplace were comparatively unsatisfactory. After discussions between representatives of RXAS and QMSI, the two companies decided to work together to refine and commercialize the RXAS pill counter, first called the "RX-Count" and later renamed the "Script Count."

The parties entered into a written contract called the "Pill Counter Agreement" in July 2007. It is the construction of this Agreement, which consists of approximately 3½ typed pages, that is at the center of the current dispute. The Agreement separates the performance of the parties into two phases. Phase 1 is called the Production System Development, and Phase 2 is called the Commercial System Production and long-term supply agreement (Docket Entry No. 40-2 at 2).

The Agreement details the respective responsibilities of both parties in Phase 1, which can be summarized as testing, development and further refinement necessary to advance the RXAS pill counter from an operative prototype into a mature device ready

4

for commercial sales. The parties agree that Phase 1 was successfully completed, and that they have since been operating pursuant to Phase 2 of the Agreement.

The contract provides that during Phase 2 "[t]he pill counter will be sold to QMSI at the most advantageous (lowest) price offered to any other company." The Agreement also entitles QMSI to "priority order fulfillment." (Docket Entry No. 40-2 at 4-5). The parties apparently agree that QMSI has purchased from RXAS numerous pill counters in compliance with these provisions of the Agreement. However, in January 2013 RXAS through counsel informed QMSI that RXAS intended to terminate the Agreement effective July 1, 2013. This written notice stated that the planned termination would end any right of QMSI to purchase pill counters from RXAS under the conditions stated in the Pill Counter Agreement. It is undisputed that RXAS continues to manufacture and sell the Script Count S-4 Pill Counter. QMSI claims that RXAS's announced termination of the Agreement amounts to a breach of the Agreement. RXAS disagrees, and argues that under applicable law it has the right to terminate the Agreement upon reasonable notice.

**ANALYSIS**

The resolution of this dispute requires the Court to construe the Pill Counter Agreement, to determine the parties' intention concerning termination. As a general rule, when resolving disputes concerning contract interpretation, the Court's task is to determine the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey,* 126

S.W.3d 897, 903 (Tenn. 2004); *Guiliano v. cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Moreover, if a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). In addition, the Court must construe the provisions of a contract in harmony with each other, as distinguished from focusing on portions in isolation, in order to promote consistency among provisions of a single contract and give meaning to the document as a whole. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 705 (Tenn. 2008).

RXAS argues that the predominant purpose of the Pill Counter Agreement was the sale of goods. The Uniform Commercial Code applies to transactions in goods. Tenn. Code Ann. § 47-2-102. RXAS insists that the U.C.C. controls and provides that a contract for successive performance of indefinite duration is terminable after a reasonable time with reasonable notification. Tenn. Code Ann. § 47-2-309(2).

QMSI disagrees and argues that a fair reading of the Agreement shows that the parties intended that QMSI's right to purchase pill counters at an advantageous price would continue "through all phases of the product life cycle," or so long as RXAS continued to sell pill counters.

As a general statement, courts have held that where a contract itself does not state its duration, it should be effective for a reasonable time or terminable at will upon reasonable notice. Where, however, the parties have indicated an intent that their contractual obligations last indefinitely until the occurrence of

a particular event, many courts have concluded that the contracts are terminable only upon occurrence of that event. *Johnson v. Welch*, 2004 WL 239756 at * 10 (Tenn. Ct. App. Feb. 9, 2004). Thus, where a contract does not include a termination date but does include the right to terminate upon a happening of specified circumstances, the court will generally interpret the contract as remaining in force until terminated for cause. *Id*.

In *Warner-Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959), the manufacturer of Listerine had agreed to pay royalties for the use of the secret formula for the product based upon the amount sold, and many years later sought to be relieved of that obligation after the secret formula was no longer secret. The manufacturer argued that the contract did not have a specific termination date and was therefore unenforceable. The court acknowledged the general rule that where the contract includes no specific termination date and the parties' intention regarding termination cannot be ascertained, the court will deem the contract terminable within a reasonable time or at will, depending upon the circumstances. *Warner-Lambert*, 178 F. Supp. at 661. Nevertheless, the court found that contracts that provide no fixed date for termination but condition the obligation upon an event which would necessarily terminate the contract are in quite a different category. *Id*. at 661-62. It is generally held that parties may contract for an indefinite term whose duration is defined by the conduct of the parties as set out in the conditions agreed to for continuation or termination. *Johnson*, 2004 WL 239756

at 11 (*citing Zee Medical Distributor Association, Inc. v. Zee Medical, Inc.*, 94 Cal. Rptr. 2d 829, 833 (Cal. Ct. App. 2000).

The undersigned now turns to the provisions of the Pill Counter Agreement to examine what the parties said about the duration of their Agreement. On the first page in the introductory paragraph entitled "Acknowledgements," the parties state as follows: "The following terms and conditions detail the conditions RXAS and QMSI will operate under through all phases of the product life cycle." Under the heading of "Agreement Summary," the parties describe Phase 2 as a "long-term supply agreement." In the "Phase 2 Summary" paragraph located at the bottom of the first page, the parties describe their agreement to define "the long term supply guarantees for QMSI." The final sentence in this paragraph states: "Phase 2 will be effective throughout the tenure of this agreement and protect both parties' long-term interests." From the foregoing statements, the Court finds that the parties clearly intended their business relationship to be a "long-term" one.

On the third page of the Agreement under the heading "Phase 2 Details," the parties include several provisions describing the intended duration of their Agreement. In the first paragraph, the parties state as follows: "Phase 2 of this agreement is structured specifically for the mature product offering developed within phase 1, but will not exclude future enhancements to better the product line by both RXAS and QMSI." In a paragraph numbered 2 in the middle of the third page, the parties include the following provision:

2. This agreement will survive any change of ownership at either RXAS or QMSI. QMSI will be granted rights to purchase pill counters directly from RXAS or any company that may obtain the rights to the counters in the future. It is an explicit requirement of this agreement that RXAS and its owners shall pass on QMSI rights to purchase the RX-Count product line in any agreement to sell or license this product line to another company or individual. The company receiving the rights to the pill counter shall be legally obligated to continue this agreement with QMSI.

In the next paragraph, numbered 3, the parties state that the right to purchase pill counters at favorable prices shall also extend to "enhanced or competitive products" for pill counting in the future:

3. If RXAS or any company controlled by the principle owner(s) of RXAS creates enhanced or competitive products for pill counting, QMSI will be granted rights to purchase the enhanced and competitive products under the same conditions (including, but not limited to price and order fulfillment priority) as the initial pill counter.

Finally, in paragraph number 4, the parties state explicitly their intention regarding the expiration date for this agreement: "There is no expiration date for QMSI rights to purchase the pill counters covered in items 2 and 3 above."

"The absence of a duration provision of a contract does not necessarily render the contract terminable at will, but instead, requires the court to look to the intention of the parties to determine what the parties' intention was concerning duration and to provide a reasonable interpretation and conclusion concerning the parties' intent." *Johnson,* 2004 WL 239756 at * 14 (*citing Hamblen County v. City of Morristown*, 584 S.W.2d 674, 677 (Tenn. Ct. App. 1979) and *Mid-Southern Toyota, Ltd. v. Bug's*

*Imports, Inc.*, 453 S.W.2d 544 (Ky. Ct. App. 1970)). From the contract provisions quoted above, the Court finds that this is not a contract in which the parties failed to address the issue of termination. Rather, the Court finds that the parties clearly expressed their intent that the rights of QMSI to purchase pill counters from RXAS or its successors in interest at "the most advantageous (lowest) price offered to any other company" would have "no expiration date" and would extend to "enhanced or competitive products for pill counting" created by RXAS or its successors in the future. Therefore, the Court finds that while the Pill Counter Agreement contains no specific termination date, the parties did intend that their Agreement would continue until the happening of a future event – the cessation of sales of pill counters by RXAS or its successors. The parties agree that RXAS continues to sell pill counters.

In its response in opposition to QMSI's motion, RXAS argues that even if RXAS has breached the Pill Counter Agreement by terminating in July 2013, QMSI breached the Agreement first when it secretly began developing a competing pill counter in July 2012 (Docket Entry No. 47 at 6-11). Here, RXAS argues that "QMSI's development of a competing pill counter is a material breach of the contract requiring QMSI to assist in the continuing commercialization of RXAS pill counters for the mutual profitability of QMSI and RXAS." (*Id*. at 9). In support of its argument, RXAS relies upon several quoted sentences from the Agreement. Following a review of these quoted provisions, the Court is unpersuaded, however, and finds that these provisions fail to

contain any agreement that would restrict QMSI's right to develop a competing pill counter.

## CONCLUSION

For the reasons stated above, the Court finds that QMSI's cross-motion for partial summary judgment should be **GRANTED**. The Court finds, as a matter of law, the Pill Counter Agreement between the parties remains in effect and binding, and that RXAS's announced intention to terminate the Agreement as of July 2013 violated the terms of the Agreement. All other issues in this case, including damages, are expressly reserved.

It is so **ORDERED**.

/s/  John S. Bryant
JOHN S. BRYANT
United States Magistrate Judge