UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| QUALITY MANUFACTURING SYSTEMS, INC., | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) | No. 3:13-cv-00260 |
| v. | ) ) | Magistrate Judge Bryant[1] |
| R/X AUTOMATION SOLUTIONS, INC., | ) ) ) | **Jury Demand** |
| Defendant/Counterclaim-Plaintiff. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

Pending before the Court are Defendant R/X Automation Solutions, Inc.'s ("RXAS's") second motion for partial summary judgment (Docket Entry 96), Plaintiff Quality Manufacturing Systems, Inc.'s ("QMSI's") motion for partial summary judgment as to RXAS's counterclaims and defenses (Docket Entry 128), and RXAS's third motion for partial summary judgment (Docket Entry 135). The motions are resolved as follows:

RXAS's second motion for partial summary judgment (Docket Entry 96) will be **GRANTED**. QMSI's claims of unjust enrichment, breach of fiduciary duty, and intentional interference with business relationships will be **DISMISSED WITH PREJUDICE**.

QMSI's motion for partial summary judgment (Docket Entry 128) will be **GRANTED** insofar as RXAS's counterclaims for violations of the Uniform Trade Secrets Act and the Tennessee Consumer Protection Act will be **DISMISSED WITH PREJUDICE**, and the motion is **DENIED** as to RXAS's counterclaims for breach of contract, defense of first breach, and breach of the duty of good faith and fair dealing.

---

[1] Upon consent of the parties, this lawsuit is proceeding before the Magistrate Judge. (Docket Entry 48).

RXAS's third motion for partial summary judgment (Docket Entry 135) will be

**GRANTED**, and QMSI's claims for breach of contract and breach of the covenant of good faith

and fair dealing will be **DISMISSED WITH PREJUDICE**.

## I.      STATEMENT OF THE CASE

This lawsuit revolves around the Pill Counter Agreement ("Agreement") entered into by

QMSI's President, Ed Stinnett, and RXAS's President, Tim Chambers, in July 2007. (Docket

Entry 1-1, pp. 23-26). The Agreement comprised of two phases: (1) transformation of RXAS's

prototype pill counter into a commercially produced system and (2) sales and marketing

agreements of the pill counter, a long-term supply guarantee for QMSI, and the accomplishment

of "any enhancements, additional features or options" into the pill counter. (Docket Entry 1-1, p.

23).

QMSI filed suit against RXAS after receiving a letter from RXAS on January 11, 2013

purporting to terminate the Agreement effective July 1, 2013. (Docket Entry 1-1, pp. 2-21, 28).

Among the counts alleged were (1) breach of contract based on the termination letter; (2) breach

of the covenant of good faith and fair dealing; (3) unjust enrichment; (4) breach of fiduciary

duty; (5) intentional interference with business relationships; and (6) a request for declaratory

judgment. (Docket Entry 1-1). RXAS answered QMSI's complaint, asserted the affirmative

defense of first breach, among others, and alleged the following counterclaims: (1) breach of

contract based on statements QMSI made regarding RXAS's pill counters, QMSI's efforts to

engineer a modified pill counter, and publically filing the Agreement; (2) violation of the

Tennessee Consumer Protection Act; (3) violation of the Uniform Trade Secrets Act; and (4) a

request for declaratory judgment. (Docket Entry 17).

Earlier in this suit, the parties filed cross-motions for summary judgment regarding a single issue: whether RXAS was entitled to terminate the Agreement upon reasonable notice. (Docket Entries 33 and 40). Denying RXAS's motion and granting QMSI's motion, the Court found that the parties intended the Agreement to continue until RXAS or its successors had ceased selling pill counters and that RXAS's termination attempt violated the terms of the Agreement. (Docket Entries 56 and 58). Rejecting RXAS's arguments to the contrary, the Court was not persuaded that the Agreement restricted QMSI's right to develop its own competing pill counter. (Docket Entry 58). The issue of damages stemming from QMSI's breach of contract claim was reserved. (Docket Entry 58).

Currently pending before the Court are three partial motions for summary judgment. (Docket Entries 96, 128, and 135). In the first motion, RXAS seeks summary judgment on QMSI's claims of unjust enrichment, breach of fiduciary duty, and intentional interference with business relationships. (Docket Entry 96). In the second motion, QMSI seeks summary judgment on RXAS's counterclaims for violations of the Uniform Trade Secrets Act, violations of the Tennessee Consumer Protection Act, breach of contract, and the defense of first breach. (Docket Entry 128). Third, RXAS seeks summary judgment on QMSI's claims of breach of contract and breach of the duty of good faith and fair dealing. (Docket Entry 135). The motions have been fully briefed and are ready for a decision.

## II.    LEGAL STANDARD

A court will grant summary judgment on each claim or defense for which no genuine dispute of material fact exists and on which the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When presented with a motion for summary judgment, the court reviews the evidence presented, drawing all reasonable inferences in the non-moving party's favor.

*Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (citation omitted). Parties may rely on the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Similar to the standard for a directed verdict, the question presented in a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The court should not, however, make credibility determinations or weigh the evidence. *Troche*, 814 F.3d at 798.

## III. ANALYSIS

### A. RXAS's Second Motion for Partial Summary Judgment

RXAS seeks summary judgment on QMSI's claims of unjust enrichment, breach of fiduciary duty, and intentional interference with business relationships. (Docket Entry 96).

#### 1. Unjust Enrichment

QMSI has withdrawn its claim of unjust enrichment. (Docket Entry 108, p. 3). RXAS's request for summary judgment as to QMSI's claim of unjust enrichment will be **GRANTED**, and the claim will be **DISMISSED WITH PREJUDICE**.

#### 2. Breach of Fiduciary Duty

In its complaint, QMSI alleged that the Agreement and the actions taken by RXAS and QMSI in developing and commercializing the pill counter resulted in a legal partnership and/or joint venture between the two companies. (Docket Entry 1-1 ¶ 64). QMSI further alleged that QMSI and RXAS "conducted a joint business undertaking for mutual profit, and placed their money, assets, and skill in commerce with the understanding that the profits would be shared between them." (Docket Entry 1-1 ¶ 64). As partners or joint venturers, QMSI alleged, the two

companies owed fiduciary duties to one another. (Docket Entry 1-1 ¶¶ 65-66). RXAS allegedly breached these fiduciary duties when it attempted to unilaterally terminate the Agreement, competed with QMSI for partnership business, and usurped corporate opportunities that were the express purpose of the parties' joint venture. (Docket Entry 1-1 ¶ 68).

RXAS argues this claim should be dismissed because the parties were never in a fiduciary relationship. (Docket Entry 98, p. 4). Although QMSI alleges that QMSI and RXAS formed a partnership or joint venture, RXAS argues that QMSI has no evidentiary support for this assertion. (Docket Entry 98, p. 5). Alternatively, RXAS argues that summary judgment should be awarded because QMSI has not established damages for the alleged breach of fiduciary duty. (Docket Entry 98, p. 7). RXAS states that the only damages information produced by QMSI is in relation to the pricing provision of the Agreement. (Docket Entry 98, p. 8). Even if a partnership existed, RXAS argues, RXAS would only be prohibited from competing with the partnership, and the partnership business would not be harmed by RXAS overcharging QMSI for pill counters. (Docket Entry 143, pp. 4-5).

QMSI argues that the Agreement created an implied partnership or joint venture between QMSI and RXAS regarding RXAS's pill counter. (Docket Entry 108, p. 4). Instead of focusing on whether each entity shared in one another's profits, QMSI argues that the proper inquiry is whether the entities were in a joint business undertaking for mutual profit. (Docket Entry 108, p. 5). According to QMSI, RXAS profits when QMSI buys a pill counter, and QMSI benefits from reselling the pill counter. (Docket Entry 108, p. 5). With respect to damages, QMSI claims that the damages underlying its pricing claim are equally applicable to a breach of fiduciary duty claim. (Docket Entry 108, p. 6).

In Tennessee, a general partnership is formed by the "association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit." Tenn. Code Ann. §§ 61-1-101(7); 61-1-202(a). "A partnership is an entity distinct from its partners." *Id.* § 61-1-201(a). A partnership may be formed explicitly or may be formed implicitly based on the parties' actions. *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991). The Tennessee Supreme Court has explained:

> If the parties' business brings them within the scope of a joint business undertaking for mutual profit—that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them—the result is a partnership whether or not the parties understood that it would be so.

*Id.* (citation omitted). The court is required to consider "all of the relevant facts, actions, and conduct of the parties . . . and [n]o one fact or circumstance is conclusive." *Webster v. Estate of Dorris*, No. M201402230COAR3CV, 2016 WL 502009, at *4 (Tenn. Ct. App. Feb. 4, 2016) (internal quotations removed) (quoting *Martin v. Coleman*, 19 S.W.3d 757, 761 (Tenn. 2000)). With some exceptions, "receipt of a share of the profits of that business is prima facie evidence that a partnership exists." *Bass*, 814 S.W.2d at 41; *see also* Tenn. Code Ann. § 61-1-202(c)(3). "When a partnership agreement is not in writing, the party alleging the existence of a partnership carries the burden of proving that fact by clear and convincing evidence." *Story v. Lanier*, 166 S.W.3d 167, 175 (Tenn. Ct. App. 2004) (citations omitted). "Generally, what will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Webster*, No. M201402230COAR3CV, 2016 WL 502009, at *4 (citation omitted).

"A joint venture is a relationship which arises from an agreement between two or more persons to undertake some common objectives for the benefit of all in pursuit of which each is authorized to act for the other." *Wyatt v. Byrd*, No. W200902635COAR3CV, 2010 WL 3063153, at *4 (Tenn. Ct. App. Aug. 3, 2010) (quoting *Ollice v. Pugh*, No. 87–8–II, 1987 WL 4902, at *4

(Tenn. Ct. App. May 27, 1987)). "A joint venture is similar, but not identical, to a partnership, and has been described by our Supreme Court as 'something like a partnership, for a more limited period of time, and a more limited purpose.'" *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001) (quoting *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995)). "Joint ventures are governed by the same rules of law as those governing partnerships." *Id.* at 605-06 (citing *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 212 (Tenn. 1992)). "The elements required to establish a joint venture are: (1) a common purpose, (2) some manner of agreement among the parties, and (3) the equal right of each "to control the venture as a whole and any relevant instrumentality." *Webster*, No. M201402230COAR3CV, 2016 WL 502009, at *7 (quoting *King v. Flowmaster, Inc.*, No. W2010–00526–COA–R3CV, 2011 WL 4446992, at *2 (Tenn. Ct. App. Sept. 27, 2011)).

In *Swecker v. Swecker*, 360 S.W.3d 422 (Tenn. Ct. App. 2011), the Court of Appeals of Tennessee affirmed the district court's finding that an "association of father and son to carry on as co-owners of a [dairy farm] for profit resulted in the formation of a partnership, because they had a joint bank account, they had the checks for milk issued in both names, and they had the cattle registered in both names." *Id.* at 425, 427 (internal quotation marks omitted). The dairy farm's business profits were placed into a joint bank account to which each partner had full control. *Id.* at 426-27. The fact that one partner was paid a set monthly salary did not alter the court's opinion that the partners shared partnership profits, especially since partners can negotiate arrangements for sharing profits. *Id.*

On the other hand, in *Webster v. Estate of Dorris*, No. M201402230COAR3CV, 2016 WL 502009 (Tenn. Ct. App. Feb. 4, 2016), the Court of Appeals of Tennessee affirmed the lower court's ruling that there was no implied partnership or joint venture between a contractor and his

real estate agent wife in the development and sale of a home. The court found it important that the wife did not act as a co-owner of the husband's contracting company. *Id.* at *5. The wife did not have the authority to control any aspect of the company's business and did not have access to the company's accounts. *Id.* Though the wife gave input regarding the cosmetic appearance of the house, her suggestions were subject to her husband's approval. *Id.* at *7. Even though the wife earned a commission from the sale of the home, that was not the type of profit sharing which would give rise to an implied partnership or joint venture. *Id.* at *6-7.

The undisputed facts before the Court are thus: the parties did not have a written joint venture or partnership agreement; the parties did not share losses, profits, or financial records with one another; the parties did not file joint tax returns or partnership tax returns involving the other; the parties did not consider themselves co-owners of the other's business; and payments made by QMSI to RXAS were based on a contracted amount, not based on a calculation of profit. (Docket Entry 98-1) (Docket Entry 109). Noticeably absent in this list is the existence of an entity separate and apart from the parties. *See* Tenn. Code Ann. § 61-1-201(a). Further, QMSI has not set forth evidence showing that QMSI and RXAS were co-owners of any business or that each company had a right to control the other's business. *See id.* §§ 61-1-101(7); 61-1-202(a); *Webster*, No. M201402230COAR3CV, 2016 WL 502009, at *7. As a matter of law, the undisputed facts do not reveal that the parties were part of an implied partnership or joint venture. QMSI has identified no other grounds for taxing RXAS with fiduciary duties. RXAS's motion for summary judgment on this claim will be **GRANTED**, and QMSI's claim for breach of fiduciary duty will be **DISMISSED WITH PREJUDICE**.

### 3. Intentional Interference with Business Relationships

QMSI alleged that RXAS's anticipatory repudiation of the Agreement constitutes intentional interference with business relationships. (Docket Entry 1-1 ¶ 72). According to QMSI, RXAS's refusal to sell pill counters to QMSI would damage QMSI's relationships with existing and prospective customers. (Docket Entry 1-1 ¶ 72). QMSI alleged that RXAS knew of these relationships and RXAS's predominant purpose in trying to terminate the Agreement was to injure QMSI's ability to compete in the marketplace. (Docket Entry 1-1 ¶ 72).

RXAS argues that QMSI is unable to establish the "improper motive or improper means" element and "damages" element of this cause of action. (Docket Entry 98, pp. 6-9). First, RXAS refers to the relevant allegation in QMSI's complaint:

> 72.    By its actions as described above, RXAS has committed the tort of intentional interference with business relationships. Specifically, RXAS's anticipatory refusal to sell pill counters to Quality will damage Quality's relationships with its existing and prospective customers. RXAS knows of these relationships and its ***predominant purpose in purporting to terminate the Pill Counter Agreement is to injure Quality's ability to effectively compete in the marketplace***. In addition to that improper motive, RXAS is employing the ***improper means of breaching its contract with Quality in order to further its tortious conduct***.

(Docket Entry 1-1 ¶ 72) (emphasis added). RXAS argues that a party's motive to compete with another entity in the marketplace is not an improper motive. (Docket Entry 98, p. 6). Next, RXAS argues that a breach of contract does not constitute "improper means" because parties are permitted to breach contracts so long as they are willing to pay the consequences. (Docket Entry 98, p. 7). Last, RXAS seeks summary judgment because QMSI has not established damages resulting from this alleged interference. (Docket Entry 98, pp. 8-9). For example, RXAS points out, QMSI has not presented affidavits or documentary evidence showing that it lost contracts that included pill counters, that QMSI's bid on contracts was affected by RXAS's pill counter

price, or that RXAS's pill counter price affected QMSI's sale of pill counters to third parties. (Docket Entry 143, p. 6). To illustrate this point, RXAS suggests that if it had sold pill counters to QMSI at a lower price and QMSI had similarly decreased the price when it sold the pill counters to third parties, QMSI would have received the same profit. (Docket Entry 143, p. 7).

QMSI maintains that its claim for breach of fiduciary duty satisfies the "improper means" requirement of this cause of action. (Docket Entry 108, p. 7). Alternatively, QMSI argues that it can establish an improper method through RXAS's alleged "sharp dealing." (Docket Entry 108, p. 8). Noting that Tennessee has not defined "sharp dealing," QMSI relies on the following definition from a federal district court bankruptcy case from Texas, *In re Sissom*, 366 B.R. 677, 700 n.34 (Bankr. S.D. Tex. 2007):

> Black's Law Dictionary does not specifically define "sharp dealing," but it defines "sharp practice" as "Unethical action and trickery, esp. by a lawyer," and further notes that the term has the archaic meaning of "unhandsome dealing." Black's Law Dictionary 1381 (7th ed. 1999). Webster's Dictionary defines "sharp practice" as "the act of dealing in which advantage is taken or sought unscrupulously." Merriam–Webster's Collegiate Dictionary Y Y 1074 (10th ed. 2001).

According to QMSI, this "sharp dealing" is evidenced by RXAS overcharging QMSI for pill counters in violation of the Agreement. (Docket Entry 108, p. 8). Regarding the damages element of this claim, QMSI relies on Glenn Perdue's expert report. (Docket Entry 108, p. 9).

In 2002, the Supreme Court of Tennessee adopted the tort of intentional interference with business relationships in *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). Liability arises if the claimant can establish the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means* . . . ; and finally, (5) damages resulting from the tortious interference.

*Id.* at 701 (emphasis in original). The following damages may be recovered: "(a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Springfield Investments, LLC v. Glob. Investments, LLC*, No. E201401703COAR3CV, 2015 WL 5064090, at *17 (Tenn. Ct. App. Aug. 27, 2015) (internal quotations removed) (quoting *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 222 (Tenn. Ct. App. 2004)). The measure of damages for interference with a business relationship or contract includes lost profits which are "measured by the loss sustained by the plaintiff's business and not by its effect upon defendant's business." *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322, 325 (Tenn. 1987).

Regardless of whether RXAS's attempt to terminate the Agreement was done for an improper motive or using improper means, QMSI's claim fails for lack of damages. The only evidence submitted to establish this crucial element is Glenn Perdue's expert report. (Docket Entry 98-5) (Docket Entry 108, p. 9). This report, however, does not show the losses allegedly sustained from the termination letter. Rather, the report purports to show that RXAS overcharged QMSI for pill counters. Causally unrelated damages cannot be used to sustain this claim. RXAS's motion for summary judgment will be **GRANTED**, and QMSI's claim for intentional interference with business relationships will be **DISMISSED WITH PREJUDICE**.

**B.  QMSI's Motion for Partial Summary Judgment**

QMSI seeks summary judgment on RXAS's counterclaims for a violation of the Uniform Trade Secrets Act, violation of the Tennessee Consumer Protection Act, breach of contract, and the defense of first breach. (Docket Entry 128).

### 1. Violation of the Uniform Trade Secrets Act

RXAS notified QMSI that it is no longer pursuing its counterclaim for a violation of the Uniform Trade Secrets Act, and RXAS does not object to entry of summary judgment on this claim. (Docket Entry 128-10) (Docket Entry 151, p. 14). Accordingly, QMSI's motion for summary judgment on this claim will be **GRANTED**, and this counterclaim will be **DISMISSED WITH PREJUDICE**.

### 2. Violation of the Tennessee Consumer Protection Act

RXAS counterclaimed that QMSI used unfair deceptive acts or practices in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101, *et seq.*, including (1) "[c]ausing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another"; (2) "[d]isparaging the goods, services or business of another by false or misleading representations of fact"; and (3) "[r]epresenting that a service, replacement or repair is needed when it is not." (Docket Entry 17, pp. 20-21). Although the offending conduct was not explicitly identified in RXAS's counterclaims, it appears that this claim is based on the following allegations. While installing and integrating a RXAS pill counter for Humana in 2011, "QMSI misrepresented RXAS'[s] contractual obligations to Humana – leading Humana to believe that RXAS was responsible for QMSI's lack of performance." (Docket Entry 17, p. 18). Around November 2012, "QMSI indicated to a customer of RXAS that RXAS'[s] pill counters were not qualified or ready for service[,] . . . QMSI was engineering a modification of the RXAS pill counter with proposed delivery of a modified prototype in December 2012 that was allegedly superior to that of RXAS[,] . . . QMSI offered the modified prototype in an attempt to interfere with a RXAS contract and in competition with RXAS'[s] pill

counter[, and] . . . [a]t no time did QMSI offer its alleged modified prototype to RXAS." (Docket Entry 17, pp. 18-19). These allegations were developed through discovery.

QMSI argues that RXAS cannot establish the damages required to sustain a claim under the TCPA. (Docket Entry 132, pp. 14-17). Though RXAS provided a list of the damages sought in its Rule 26(a)(1)(A)(iii) disclosures (Docket Entry 128-7, p. 15) and supplemented disclosures (Docket Entry 128-8, p. 4), QMSI states it has not received evidence of specific damages supporting this claim and argues that the damages sought by RXAS were not caused by the conduct RXAS claims was unfair or deceptive. (Docket Entry 132, pp. 15-16). The damages sought by RXAS, QMSI argues, are related to QMSI's failure to share modification information with RXAS and the extra cost RXAS bears while selling pill counters to QMSI at a low price. (Docket Entry 132, pp. 15-16). QMSI notes that RXAS's President, Tim Chambers, previously testified in a Rule 30(b)(6) deposition that RXAS had not lost a single contract as a result of QMSI disparaging RXAS to its identified customers. (Docket Entry 132, p. 17). QMSI additionally argues that RXAS should not be permitted to rely on previously undisclosed damages evidence which was first produced in response to QMSI's motion for summary judgment. (Docket Entry 166, p. 10). This is referring to RXAS's claim that it expended additional time with clients and provided free training to mitigate the negative effects of QMSI's disparagement. (Docket Entry 166, p. 10). Relying on Sixth Circuit precedent, QMSI requests that these damages be barred since they were not timely disclosed per Rule 26(a)(1), QMSI has not had a chance to conduct discovery regarding these damages, and RXAS has not provided a good explanation for seeking these damages so late in the case. (Docket Entry 166, p. 11).

RXAS argues that QMSI is applying too narrow an approach to proving damages, noting that the statute permits recovery for an ascertainable loss of a "thing of value," not just a loss of

money or property. (Docket Entry 151, p. 13). To rebut QMSI's claim that RXAS has suffered no damages, RXAS submitted an affidavit from its President, Tim Chambers. (Docket Entry 151-7). While QMSI's disparagement of RXAS may not have lost RXAS contracts, RXAS argues, QMSI's misrepresentations about RXAS to the Department of Veterans Affairs ("VA") and other customers "did result in the loss of time and the necessity of providing free services in order to restore the client's confidence in RXAS's product and personnel." (Docket Entry 151, p. 13) (Docket Entry 151-7). RXAS cites another example in which QMSI purchased RXAS pill counters for the "Kaiser Portland job," but did not purchase the recommended installation and operations training from RXAS. (Docket Entry 151, pp. 13-14) (Docket Entry 151-7). When Kaiser encountered difficulties with the pill counters, QMSI allegedly told Kaiser that RXAS's pill counters were defective and that RXAS was unresponsive. (Docket Entry 151, p. 14) (Docket Entry 151-7). RXAS ultimately provided the training and set-up to Kaiser at no cost, though it should have cost approximately $8,000. (Docket Entry 151, p. 14) (Docket Entry 151-7).

A plaintiff may recover under the TCPA by establishing "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated.'" *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). To satisfy the second prong of this cause of action, the defendant must have caused a tangible economic loss. *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495, 510 (Tenn. 2012) (holding that a person's cremation remains have sentimental and emotional value but not the tangible economic value required to state a claim under the TCPA). The damages alleged must

be caused by the "unfair or deceptive act or practice." *Hamlin v. Trans-Dapt of California, Inc.*, 584 F. Supp. 2d 1050, 1058 (M.D. Tenn. 2008) (internal quotations removed) (quoting *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006)). The damages must be "more than trivial or speculative." *Waggin' Train, LLC v. Normerica, Inc.*, No. 1:09-CV-01093, 2010 WL 145776, at *4 (W.D. Tenn. Jan. 8, 2010) (emphasis removed) (quoting *Tucker*, 180 S.W.3d at 117). "A loss is ascertainable if it is measurable, even though the precise amount of the loss is unknown." *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012) (quoting *State v. New Beginning Credit Ass'n, Inc.*, No. M1999-00461-COA-R3CV, 2006 WL 1472284, at *8 (Tenn. Ct. App. May 25, 2006)).

While the damages claimed in Tim Chambers' affidavit may suffice to establish a claim under the TCPA, this affidavit is too little too late. As QMSI has argued, the initial disclosures submitted by RXAS identify damages stemming from RXAS's breach of contract claim.[2] QMSI cited additional evidence which tends to show that RXAS did not suffer an ascertainable loss as is required by the TCPA. Ron Boneberg, a former director of the VA, testified that a meeting with QMSI employees in January 2013 had "raised red flags," but that a subsequent meeting with RXAS employees had resolved those concerns and that RXAS had not lost any business from the VA as a result of QMSI's conduct. (Docket Entry 128-6). Acting on behalf of RXAS in a Rule 30(b)(6) deposition, Tim Chambers testified that RXAS had not lost any contracts from customers to whom RXAS believes that QMSI made disparaging statements about RXAS.

---

[2] Estimating actual damages in the range of $100,000 and $1,000,000, RXAS explained that these damages were calculated "as the measure of the value of research and development incurred by QMSI in development of QMSI's pill counter and the failure to timely share the information with RXAS [and] . . . the value of research and development incurred by QMSI in development of enhancements, additional features, functions, or options of any RXAS pill counter and the failure to timely share the information with RXAS." (Docket Entry 128-8, p. 4). RXAS additionally includes the cost of performing under the Agreement in its damages calculation and seeks any other damages discussed in deposition testimony or discovery responses. (Docket Entry 128-8, p. 4). These articulated damages are unquestionably linked to RXAS's contention that QMSI breached the Agreement by developing pill counter modifications.

(Docket Entry 154 ¶ 23). Additionally, RXAS has not submitted an expert report regarding its alleged damages. (Docket Entry 154 ¶ 22).

The only evidence offered by RXAS, Tim Chamber's affidavit, is untimely. Fact discovery closed on September 11, 2015. (Docket Entry 62 ¶ 7). RXAS supplemented its initial disclosures on September 24, 2015. (Docket Entry 128-8). Tim Chambers' affidavit was signed and submitted on February 12, 2016. (Docket Entry 151-7). Importantly, the information that RXAS now seeks to add, additional time and training expended to appease its clients, was solely in RXAS's control. Any chance of QMSI conducting discovery regarding these alleged damages has long since passed. Absent a showing that this late production was substantially justified or harmless, the affidavit may not be used to oppose QMSI's motion for partial summary judgment. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *see also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 366-70 (6th Cir. 2010). Having not been provided an explanation for this late piece of evidence, its exclusion is mandatory. As a result, RXAS has not set forth evidence of an ascertainable loss. QMSI's motion for summary judgment on this counterclaim will be **GRANTED**, and the counterclaim will be **DISMISSED WITH PREJUDICE**.

### 3. Breach of Contract

RXAS alleged that QMSI "materially breached the contract by stating RXAS'[s] pill counters were not qualified or ready for service. [QMSI] also breached the contract by engineering a modified prototype and offering the modified prototype in competition with RXAS based on the proprietary information of RXAS." (Docket Entry 17 ¶ 58). RXAS argued that

QMSI's actions violated the requirement in the Agreement to "enhance the profitability of RXAS"[3] and breached the implied covenant of good faith and fair dealing. (Docket Entry 17 ¶¶ 59, 61). Next, RXAS argued that QMSI violated the confidentiality clause in the Agreement when it filed the Agreement as an exhibit to the complaint. (Docket Entry 17 ¶¶ 62-63).

### a. Modification Information

In its counterclaims RXAS alleged that a QMSI employee told a RXAS customer that QMSI was creating a modification of RXAS's pill counter, that QMSI offered the modified prototype in an attempt to compete with RXAS, and that QMSI did not offer this modified prototype to RXAS. (Docket Entry 17, p. 19). RXAS alleged that this conduct, engineering a modified prototype and offering the modified prototype in competition with RXAS based on RXAS's proprietary information, constitutes a breach of contract. (Docket Entry 17, pp. 19-20).

RXAS's contention that the Agreement required QMSI to share modification information is based on these portions of the Agreement:

> Phase 2 Summary – . . . In addition, **any enhancements, additional features or options** will be accomplished during Phase 2. . . .

> Phase 2 of this agreement is structured specifically for the mature product offering developed within phase 1, but will not exclude **future enhancements** to better the product line by both RXAS and QMSI. . . .

> 7. **Suggestions for testing**, i.e., what products to test, where to test, competitive product results for comparison **will also be provided to RXAS by QMSI**. No data protected by non-disclosure agreements with other manufacturers will be provided.

---

[3] Moving for summary judgment, QMSI argued that that no duty arose from this single provision because it is precatory and is not sufficiently definite. (Docket Entry 132, pp. 5-7). RXAS responded that its breach of contract claims should be assessed in the context of the entire Agreement, not this specific provision. (Docket Entry 151, p. 2). Tennessee contract law supports RXAS's position which will be followed in this order. *See Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (quoting *Cocke Cty. Bd. of Highway Comm'rs v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)) ("In construing a contract, the entire contract should be considered in determining the meaning of any or all of its parts. It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.").

8.    Although any suggestions will be considered, it is understood that RXAS is not obligated to incorporate ***suggestions proposed by QMSI for functions and features that will make the products more applicable for use in automated pharmacies***.

(Docket Entry 128-1, pp. 1, 3-4) (emphasis added).

QMSI argues that the Agreement did not require QMSI to share information with RXAS concerning modifications to RXAS's pill counter. (Docket Entry 132, p. 8). Arguing that the parties never intended such an obligation, as established through their course of dealing, QMSI states that RXAS never asked QMSI to share information regarding these modifications. (Docket Entry 132, p. 9). In support of this statement, QMSI references the deposition testimony of RXAS President Tim Chambers. (Docket Entry 128-3, p. 7). QMSI's summary of Tim Chambers' testimony is, however, cherry-picked. Tim Chambers was asked if RXAS had requested pill counter improvement information from QMSI. While he responded that he did not believe RXAS had made a specific inquiry for this information, he also testified "I think [the Agreement] explicitly states that they're required to provide the information." (Docket Entry 128-3, p. 7). QMSI notes that its modifications to RXAS's pill counter never passed the theoretical stage, so no "competitive product results" were produced and argues that the phrase "competitive product results for testing" does not encompass QMSI's own ideas for improving pill counters. (Docket Entry 132, p. 11). Last, QMSI argues that the conclusion in the Court's order granting its first motion for partial summary judgment, stating that the Agreement did not prohibit QMSI from developing its own competing pill counter, likewise applies to this legal question. (Docket Entry 132, p. 12). On a procedural note, QMSI also argues that RXAS failed to allege this claim in its counterclaims and should be precluded from pursuing the claim. (Docket Entry 132, p. 4) (Docket Entry 166, p. 5).

RXAS argues that the Agreement clearly encompasses modifications made to RXAS's pill counter after QMSI and RXAS successfully created a pill counter for commercialized use. (Docket Entry 151, p. 3). Relying on the Agreement language quoted above, RXAS emphasizes that Section 7 uses the mandatory term "will" rather than "may" when stating "Suggestions for testing, i.e., what products to test, where to test, competitive product results for comparison ***will also be*** provided to RXAS by QMSI." (Docket Entry 151, p. 4) (emphasis added). Countering QMSI's argument that RXAS was required to request modification information, RXAS again emphasizes the mandatory word "will" in the Agreement and notes that QMSI was not particularly forthcoming with information even in response to discovery requests. (Docket Entry 151, p. 5). Regarding QMSI's argument that its modifications to RXAS's pill counter never came to fruition, RXAS argues that there is enough evidence to suggest that QMSI stopped developing these modifications because of the litigation, not for an engineering reason. (Docket Entry 151, p. 5). In support of this argument, RXAS cites the deposition testimony of Kurt Hill who stated that QMSI had built a particular prototype that worked really well. (Docket Entry 151-1, p. 4). An expert report from Ronald Goulet is also cited, wherein Dr. Goulet noted the differences between QMSI's and RXAS's pill counter designs and stated that QMSI had rudimentary prototypes. (Docket Entry 151-2). Additionally, RXAS argues that summary judgment should not be granted on account of lack of damages evidence. (Docket Entry 151, p. 6). RXAS states that it is awaiting relevant information which is the subject of a motion to compel which has been granted in RXAS's favor. (Docket Entry 186, pp. 1-2). Alternatively, RXAS suggests that the value of these modifications may be calculated based on the amount QMSI paid to conduct the research, which exceeds $100,000. (Docket Entry 151, pp. 7-8).

The procedural challenge to RXAS's counterclaim is addressed first. QMSI contends that this claim is unpled and that RXAS should therefore be prevented from pursuing relief. The Court addressed a similar argument when ruling on QMSI's motion to file an amended complaint. (Docket Entry 178). In that order, the Court explained the basic pleading requirements as follows:

> A complaint must contain a basis for the court's jurisdiction, "a short and plain statement of the claim showing that the pleader is entitled to relief," and a demand for relief. Fed. R. Civ. P. 8(a). This pleading standard exists to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (2007)). To state a claim for breach of contract under Tennessee law, the plaintiff must allege "(1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Arch Wood Prot., Inc. v. Flamedxx, LLC*, 932 F. Supp. 2d 858, 866 (E.D. Tenn. 2013) (quoting *Nw. Tennessee Motorsports Park, LLC v. Tennessee Asphalt Co.*, 410 S.W.3d 810, 817 (Tenn. Ct. App. 2011)). "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). Black's Law Dictionary defines "justice" as "1. The fair treatment of people. 2. The quality of being fair or reasonable. 3. The legal system by which people and their causes are judged; esp., the system used to punish people who have committed crimes. 4. The fair and proper administration of laws." *Justice*, <u>Black's Law Dictionary</u> (10th ed. 2014).

(Docket Entry 178, pp. 3-4). In the motion to amend, the Court was confronted with the request to add a claim for overpricing in violation of the Agreement where the breach of contract claim pled was solely based on anticipatory repudiation of the Agreement. (Docket Entry 178). Explaining that a reasonable reading of the complaint would not put the opposing party on notice of the overpricing claim, the Court concluded that the original complaint did not allege the overpricing claim. (Docket Entry 178, pp. 4-6). The same conclusion does not apply, however, to RXAS's instant breach of contract claim. RXAS clearly claimed that QMSI's attempts to build a modified pill counter violated the terms of the Agreement. This allegation is broad enough to put a party on notice that RXAS was challenging QMSI's attempt to develop its own pill counter as

well as QMSI's attempt to develop modifications to RXAS's pill counter. The argument that this claim should be dismissed as unpled is unpersuasive.

Attending to the merits of this claim, the Court finds, as a matter of law, that the Agreement obligated QMSI to share modification suggestions with RXAS, but only pertaining to RXAS's S-4 pill counter. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles." *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995) (citations omitted). If the contract is unambiguous, the plain and ordinary meaning of the contract shall govern. *Id.* (citations omitted). The Agreement explicitly states that during Phase 2 testing suggestions "will . . . be provided to RXAS by QMSI." (Docket Entry 128-1, p. 4). Read in connection with the next section of the Agreement, these suggestions include "functions and features that will make the products more applicable for use in automated pharmacies." (Docket Entry 128-1, p. 4). This obligation is further reinforced by the Phase 2 summaries throughout the Agreement: "any enhancements, additional features or options will be accomplished during Phase 2," and "Phase 2 of this agreement is structured specifically for the mature product offering developed within phase 1, but will not exclude future enhancements to better the product line by both RXAS and QMSI." (Docket Entry 128-1, pp. 1, 3). As the Court has already explained, the Agreement did not "contain any agreement that would restrict QMSI's right to develop a competing pill counter." (Docket Entry 58, pp. 10-11). The Agreement did, however, require QMSI to give RXAS suggestions for the enhancement of RXAS's pill counter throughout the lifetime of Phase 2. RXAS submitted evidence of QMSI's independent attempts to enhance RXAS's S-4 pill counter. (Docket Entry 151-3) (Docket Entry 151-4). QMSI's

motion for summary judgment on this claim as well as on RXAS's defense of first breach will therefore be **DENIED**.

### b. Covenant of Good Faith and Fair Dealing

RXAS's counterclaim for breach of the covenant of good faith and fair dealing is based on QMSI's development of a pill counter and QMSI's alleged statement that RXAS's pill counters were not qualified or ready for service. (Docket Entry 17, pp. 19-20).

QMSI argues that neither of these actions violated the "mutual profitability precatory clause or any other provision of the [Agreement]." (Docket Entry 132, pp. 12-13). According to QMSI, RXAS has been developing another factual basis for this claim but has not amended its counterclaim to include this new allegation: the allegation that QMSI's President met with Ron Boneberg from the Department of Veteran's Affairs and made negative remarks about RXAS's pill counters. (Docket Entry 132, p. 13) (Docket Entry 166, p. 5). Regardless, QMSI states, Ron Boneberg smoothed this issue out with RXAS, and RXAS suffered no damages from this alleged statement. (Docket Entry 132, p. 13).

RXAS argues that the parties' intention when entering into the Agreement was to "commercialize the RX-Count, provide viable alternatives to the consuming marketplace and enhance the profitability of RXAS and QMSI." (Docket Entry 151, p. 10). RXAS maintains that QMSI's disparagement of RXAS's pill counters ran contrary to this stated purpose and therefore violated the duty of good faith and fair dealing. (Docket Entry 151, pp. 9-12). For example QMSI's President, stated in a Rule 30(b)(6) deposition that he told a customer that RXAS's pill counters were not fully qualified or ready for service. (Docket Entry 151-5, p. 8). Additionally, RXAS argues that QMSI's secret modifications of RXAS's pill counters violated this covenant,

as the parties reasonably expected to work with one another to develop and sell RXAS's pill counter. (Docket Entry 151, p. 12).

In Tennessee, every contract contains an implied duty of good faith and fair dealing in the performance and enforcement of the contract. *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (citations omitted). "[E]ach contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same." *Goot v. Metro. Gov't of Nashville & Davidson Cty.*, No. M200302013COAR3CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005). This covenant serves two purposes: (1) "it honors the contracting parties' reasonable expectations" and (2) "it protects the rights of the parties to receive the benefits of the agreement they entered into." *Id.* (citations omitted). Whether a party acted in good faith in the performance of a contract depends on a reasonable construction of the language in the instrument and the parties' intentions. *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) (quoting *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 643 (Tenn. Ct. App. 2006)). "The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Goot*, No. M200302013COAR3CV, 2005 WL 3031638, at *7.

The parties entered into the Agreement with "[t]he common interest . . . to commercialize the RX-Count, provide viable alternatives to the consuming marketplace and enhance the profitability of RXAS and QMSI." (Docket Entry 128-1, p. 3). Upon completion of Phase 1, transforming the RX-Count from a prototype to a commercially produced system, Phase 2 governed the parties' contractual obligations. (Docket Entry 128-1). RXAS received the rights to the technology, and QMSI received the right to purchase the pill counter at a low price and with

priority order fulfillment. (Docket Entry 128-1, pp. 3-4). In addition, QMSI was required to submit testing suggestions to RXAS which RXAS could, but was not required to, incorporate. (Docket Entry 128-1, p. 4). Though the Agreement does not contain a specific "duty to not disparage," competing with one another in the sale of RXAS's pill counters would hardly seem to fit within the realm of expected or permissible conduct. The conduct alleged in RXAS's counterclaim, QMSI's undisclosed pill counter modifications and QMSI's negative statements about RXAS's pill counters, fits squarely within the realm of actions governed by the duty of good faith and fair dealing. QMSI's motion for summary judgment as to this claim will be **DENIED**.

### c. The Confidentiality Clause

The Agreement states: "*Unless otherwise permitted by QMSI, this agreement and its content will be kept confidential. It will not be disclosed to potential customers or to companies offering products in competition with either QMSI or RXAS.*" (Docket Entry 128-1, p. 4) (emphasis added). RXAS counterclaimed that QMSI's public filing of the Agreement as an exhibit to the complaint breached this provision of the Agreement. (Docket Entry 17, p. 20).

QMSI argues that the Agreement gives QMSI a unilateral right to disclose the Agreement and maintains that the second sentence of the confidentiality clause does not condition QMSI's right to disclose the Agreement. (Docket Entry 132, pp. 7- 8). Permitting the second sentence to condition the first sentence, QMSI states, would render the first sentence meaningless. (Docket Entry 132, p. 8). QMSI states that even if RXAS's interpretation of the confidentiality provision is correct, filing the Agreement with the Court did not violate the provision because the Court is not a potential customer or a competing company. (Docket Entry 166, p. 4). The fact that one of

these prohibited recipients could happen across the Agreement in the Court's files, QMSI states, is not a breach of the provision. (Docket Entry 166, p. 4).

RXAS argues that the confidentiality provision grants QMSI the right to unilaterally share the Agreement with others so long as QMSI does not share the Agreement with potential customers or competing companies. (Docket Entry 151, p. 8). According to RXAS, the second sentence provides no value unless it conditions the first sentence. (Docket Entry 151, pp. 8-9). Additionally, RXAS claims that QMSI's admissions in a Rule 30(b)(6) deposition, that QMSI's President had disclosed terms of the Agreement to customers William Toy and either Atin Kapadia or Mike Mahar at Humana, violated the Agreement. (Docket Entry 151, p. 9) (Docket Entry 151-5, pp. 11-12).

If the language in a contract is unambiguous, the plain meaning of the provisions controls. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (citations omitted). The court should give a "reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." *Id.* (citation omitted).

This contract provision is clear and unambiguous. A plain reading of the confidentiality provision results in the following restrictions: RXAS may not disclose the Agreement to any entity without QMSI's permission and may not disclose the Agreement to a potential customer or a competitor; QMSI may disclose the Agreement to any non-potential customer or non-competitor; and neither RXAS nor QMSI may disclose the Agreement to a potential customer or a competitor. QMSI's claim that the second sentence of the confidentiality provision should not limit the first is unpersuasive. If, as QMSI argues, QMSI is empowered to disclose the Agreement to any entity of its choosing, the second sentence would be rendered superfluous, violating well-engrained principles of contract interpretation.

Regardless of whether filing the Agreement as an exhibit to the complaint violated the confidentiality provision of the Agreement, a genuine dispute of material fact exists concerning QMSI's disclosure of the Agreement to customers William Toy and either Atin Kapadia or Mike Mahar at Humana. QMSI's motion for partial summary judgment on RXAS's claim for breach of contract based on a violation of the confidentiality provision will therefore be **DENIED**.

## C. RXAS's Third Motion for Partial Summary Judgment

RXAS seeks summary judgment on QMSI's counts for breach of contract and breach of the covenant of good faith and fair dealing. (Docket Entry 135).

In its complaint, QMSI alleged that RXAS's termination letter violated the terms of the Agreement and alleged that RXAS violated the duty of good faith and fair dealing in connection with the Agreement. (Docket Entry 1-1 ¶¶ 50-59). In a separate count, QMSI sought declaratory relief. (Docket Entry 1-1 ¶¶ 75-78).

Earlier in this proceeding, QMSI sought partial summary judgment on its breach of contract claim and request for declaratory judgment. (Docket Entry 40). The Court granted this motion, finding that the parties intended that the Agreement would continue until RXAS or its successors ceased selling pill counters. (Docket Entry 58, p. 10). Since RXAS was still manufacturing and selling pill counters as of the date of the decision, the Court found, as a matter of law, that the Agreement remained in effect and binding and found that RXAS's termination letter violated the terms of the Agreement. (Docket Entry 58, pp. 5, 11). The issue of damages was reserved. (Docket Entry 58, p. 11).

Presently, RXAS argues that summary judgment should be awarded for the breach of contract and breach of the covenant of good faith and fair dealing claims for lack of damages. First, RXAS claims that QMSI is not entitled to pre-trial breach of contract damages because

QMSI elected the remedy of specific performance when it moved for summary judgment. (Docket Entry 138, pp. 3-5) (Docket Entry 169, pp. 7-9). RXAS interprets the Court's order granting QMSI's motion for summary judgment as requiring specific performance of the Agreement until trial, a contractual remedy. (Docket Entry 138, p. 5). Prospectively, RXAS argues, specific performance is an inappropriate remedy because damages are sufficient and because specific performance in this case would be unfair, unconscionable, and unsupported by adequate consideration. (Docket Entry 138, pp. 5-7) (Docket Entry 169, p. 9). Transitioning to damages, RXAS argues that QMSI cannot establish that it suffered damages as a result of the termination letter because RXAS has performed under the Agreement during the relevant time period. (Docket Entry 138, pp. 7-8). RXAS additionally believes it can prove that QMSI breached the Agreement before RXAS's termination letter, which would preclude QMSI from seeking damages. (Docket Entry 138, p. 8). Finally, RXAS argues that the damages claimed by QMSI do not have evidentiary support and that the only evidence of damages submitted by QMSI is causally unrelated to the active claims in the case. (Docket Entry 138, pp. 11-20) (Docket Entry 169, pp. 5-6).

QMSI clarifies that its earlier motion for summary judgment sought declaratory judgment that the Agreement remained in force and partial summary judgment on liability of QMSI's breach of contract claim, not an order of specific performance. (Docket Entry 158, p. 3). Regardless of the outcome of the contract claims, QMSI argues that it is nevertheless entitled to declaratory judgment that the Agreement remains in force. (Docket Entry 158, pp. 2-4). Challenging RXAS's argument that specific performance is not merited, QMSI criticizes RXAS's failure to point to evidence showing that the Agreement is unconscionable. (Docket Entry 158, p. 4). QMSI additionally argues that the Court should hear its pricing claim

accompanied by Glenn Perdue's expert report establishing the pricing claim damages. (Docket
Entry 158, pp. 6-16).

To state a claim for breach of contract under Tennessee law, the plaintiff must allege "(1)
the existence of an enforceable contract, (2) non-performance amounting to a breach of the
contract, and (3) damages caused by the breached contract." *Arch Wood Prot., Inc. v. Flamedxx,
LLC*, 932 F. Supp. 2d 858, 866 (E.D. Tenn. 2013) (quoting *Nw. Tennessee Motorsports Park,
LLC v. Tennessee Asphalt Co.*, 410 S.W.3d 810, 816-17 (Tenn. Ct. App. 2011)). A claim for
breach of the covenant of good faith and fair dealing "is not a cause of action in and of itself but
as a part of a breach of contract cause of action." *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888,
894 (Tenn. Ct. App. 2000). Accordingly, dismissal of the breach of contract claim will result in
dismissal of the related good faith and fair dealing allegation. *Thomas v. Meharry Med. Coll.*, 1
F. Supp. 3d 816, 829 (M.D. Tenn. 2014).

Remedies available for breach of contract in Tennessee include (1) damages, (2) specific
performance, and (3) restitution. *Avery Place, LLC v. Highways, Inc.*, No.
M201402043COAR3CV, 2015 WL 8161848, at *8 (Tenn. Ct. App. Dec. 7, 2015) (citing
*Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108, 110 (Tenn. Ct. App. 1975)). An
award of damages is intended to put the nonbreaching party in the position he or should be in had
the contract been fully performed. *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d
166, 206 (Tenn. Ct. App. 2010) (citation omitted). Where an award of damages would be
inadequate, the court may exercise its discretion and decree specific performance. *Hillard v.
Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000) (citing *Shuptrine v. Quinn*, 597 S.W.2d
728, 730 (Tenn. 1979)). "Where damages are practicable and would be adequate, the Court
should not compel specific performance but should leave the plaintiff to its legal remedies."

*Hometown Folks, LLC v. S & B Wilson, Inc.*, No. 1:06-CV-81, 2008 WL 918519, at *1 (E.D. Tenn. Apr. 3, 2008), *aff'd*, 643 F.3d 520 (6th Cir. 2011) (citing *Lane v. Associated Housing Developers, LLP*, 767 S.W.2d 640, 642 (Tenn. Ct. App. 1988)). Typically, specific performance is appropriate in cases concerning contracts for the conveyance of real property due to the unique nature of the property. *McCullough v. Silverfield*, 215 S.W.3d 356, 366 (Tenn. Ct. App. 2006) (quoting *McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998)). Whether specific performance is merited is within the sound discretion of the trial court and depends on the facts presented. *Id.* (quoting *McGaugh*, 996 S.W.2d at 191).

Liability for QMSI's breach of contract claim has already been established. Dismissal of the claim is warranted, however, as QMSI has not submitted evidence establishing damages causally connected to this breach. There is no dispute that RXAS has complied with the Agreement throughout the pendency of this lawsuit. RXAS submitted a termination letter to QMSI in January 2013, effective July 2013. (Docket Entry 1-1, p. 28). During a May 2013 initial case management conference, RXAS offered to continue abiding by the Agreement throughout the suit, which QMSI accepted. (Docket Entry 22, p. 6). In September 2014, the Court granted QMSI's partial motion for summary judgment, finding that the parties intended that the Agreement would continue until RXAS ceased selling pill counters and that RXAS's termination letter violated the terms of the Agreement. (Docket Entry 58, p. 10). The matter of damages was reserved. (Docket Entry 58, p. 11). Upon review of the parties' currently pending briefs, it is apparent that the order granting QMSI's motion for partial summary judgment was interpreted differently by the parties. Whereas QMSI correctly understood the order to clarify the end-date envisioned by the parties when they entered into the Agreement, RXAS perceived the order as a

decree of specific performance throughout the remainder of the lawsuit. As a result, RXAS has continued to perform under the Agreement.

Up to this point, RXAS's termination letter has not prevented QMSI from receiving the benefit of the bargain in the Agreement. QMSI has not submitted evidence showing otherwise. The only damages evidence provided is Glenn Perdue's expert report which relates to QMSI's unpled pricing claim. Going forward, QMSI has not convinced the Court that monetary damages would be an insufficient remedy for a breach of contract. Absent compelling arguments in favor of a decree of specific performance, the undersigned will not exercise the Court's discretion to require the parties to perform the Agreement at this time.

QMSI has failed to create a genuine question of fact with respect to damages. As this is a required element for any breach of contract claim, RXAS's motion for summary judgment on QMSI's claims for breach of contract and breach of the covenant of good faith and fair dealing will be **GRANTED**, and these claims will be **DISMISSED WITH PREJUDICE**.

It is so **ORDERED**.

/s/ John S. Bryant
JOHN S. BRYANT
United States Magistrate Judge